| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| vs. | : | CRIMINAL NO. 3:16CR048(MPS) |
| NATHANIEL SMITH | : | April 5, 2020 |

## MEMORANDUM IN SUPPORT OF MOTION FOR SENTENCE REDUCTION UNDER FIRST STEP ACT (COMPASSIONATE RELEASE)

The Defendant, Nathaniel Smith, submits this memorandum in support of his motion for sentence reduction under the First Step Act. Extraordinary and compelling reasons support Mr. Smith's immediate release from prison. When the Court sentenced Mr. Smith in 2017, it did not intend its sentence to be a death sentence, but that is the reality that Mr. Smith now faces, in light of the combination of his severe and debilitating health condition, and the COVID-19 pandemic.

Myotonic Muscular Dystrophy Type 1 ("DM1") is a chronic, multisystem, genetic, degenerative neurological disorder. It attacks various systems of the body—including muscles (causes muscle weakness), eyes (cataracts), cardiac conduction abnormalities, and the central nervous system (cognitive impairment)—until early death results. DM1 is the most severe kind of Muscular Dystrophy, affecting only 40,000 people in the United States. DM1's symptoms are "progressive" and "debilitating." DM1 creates far-reaching deficits in the brain and central nervous system, as well as serious physical impairments, including:

➢ Cardiac dysrhythmias;

➢ Postoperative apnea (temporary cessation of breathing due to deterioration of muscles in mouth and airways);

➢ Sleep disturbance (or sleep apnea; temporary cessation of breathing during sleep);

➢ Cognitive, speech, hearing, strength or coordination dysfunction in early to late childhood;

➢ Clinical myotonia (inability to relax muscles after vigorous effort);

➢ Communication difficulties;

➢ Pain and fatigue;

➢ Dysphagia (difficulties or discomfort when swallowing); and

➢ Bowel and bladder incontinence.

Mr. Smith suffers from all of these physical manifestations of DM1, many of which put his life in grave danger as a result of the COVID-19 pandemic. Accordingly, Mr. Smith asks the Court to release him under 18 U.S.C. § 3582(c)(1)(A)(i), which grants courts the authority to modify sentences based on "extraordinary and compelling" reasons.

Mr. Smith has a comprehensive release plan in place, which is attached hereto at Exhibit G. In addition, he proposes that upon release, he would be on home detention subject to GPS monitoring and subject to a set of stringent conditions for the remainder of his sentence and his term of supervised release of 15 years.

Mr. Smith respectfully asks the Court to consider this motion on an expedited basis, as each day in custody brings renewed risk to Mr. Smith's health and life.

I.      **Procedural and Factual Background**

On December 13, 2016, Nathaniel Smith appeared before this Court and entered a guilty plea to one count of Use of Interstate Facility to Entice a Minor to Engage in Sexual Activity, in violation of 18 U.S.C. § 2422(b).

On April 7, 2017, Mr. Smith appeared for sentencing. The Court determined that the applicable Guidelines range was 324-405 months. Mr. Smith argued for a below-Guidelines sentence and put forth extensive evidence regarding his medical condition, Myotonic Muscular Dystrophy Type 1. Specifically, Mr. Smith presented evidence that DM1 is a progressively

debilitating illness with no cure that significantly shortens Mr. Smith's life expectancy. DM1 has caused Mr. Smith to suffer myriad cognitive and physical impairments, including an IQ in the low 80s, adaptive functioning in the lowest .4% of the population, cardiac disease (specifically, a first degree atrial ventricular block and possible bundle branch block that was later diagnosed at Wyatt as a complete block) and weakening of his respiratory muscles, such that it is difficult for him to breathe. PSR ¶ 72-73; Defendant's Sentencing Memo, Doc. # 49. The Court departed downward pursuant to U.S.S.G. § 5H1.3 due to the impact of Mr. Smith's "rare and severe condition on his conduct." Statement of Reasons, Doc. # 64. The Court imposed 146 months of incarceration and 15 years of supervised release. Id.

Mr. Smith has been in continuous custody since the date of his arrest, January 25, 2016, which amounts to approximately 50 months of incarceration. Counting good time credits, he has served 56 months. He is currently housed at USP Marion, in Marion, Illinois.

Since being sentenced, Mr. Smith's medical condition has deteriorated. He continues to suffer from respiratory issues leading to shortness of breath, but has also developed pain and muscle weakness in his legs and is only able to walk with a cane. He has fallen at least 6 times since being incarcerated, and on one occasion, split open his lip. When he is subject to body searches, which include searches of the bottom of his feet, he is unable to support himself on one foot ,while the other is searched, and so the correctional officers must physically hold him up. Because of his muscle weakness, it is difficult for him to get out of bed. It takes him at least five minutes to move from a reclining to a standing position with the assistance of his cane. When using the toilet and shower, he must lean against the wall to avoid falling. His movements are generally slow, which means that he is unable to finish eating his food in the allotted time and usually is unable to finish meals. He has had difficulty getting timely treatment. Mr. Smith waited

8-9 months for BOP to provide eyeglasses to treat his DM1-related vision problems, but he finally has them.

Undersigned counsel spoke with Dave Hilliard, Mr. Smith's stepfather, who described Mr. Smith's current symptoms as follows: lack of muscle tone and muscle wasting, cardiac arrhythmias, respiratory impairments (frequent lung infections, sleep apnea, and aspiration of food/fluids), gastrointestinal issues (difficulty swallowing and irritable bowel issues), cataracts/drooping eyelids, excessive daytime sleepiness, thinking and problem-solving issues, and low blood pressure.

While in BOP, Mr. Smith participated in the TRAIN program, a program to change criminal thinking patterns. Upon completion, he received a certificate. He also took a music therapy class. He has also been working at UNICOR, where he builds clips for A-frame roofs. He is only able to maintain the job because he can do it while sitting.

Mr. Smith received minor tickets in 2018 for refusing an assignment. He refused because of fear that other inmates, who had learned of his charges and threatened him, were going to assault or kill him. Shortly thereafter, the facility transferred him out to his current facility.

Mr. Smith was not able to submit a request for compassionate release to his warden on his own because of his cognitive difficulties, but counsel submitted the request for him on April 3, 2020. See Exhibit H.

## II.   The Court may reduce Mr. Smith's sentence pursuant to the First Step Act if extraordinary and compelling reasons warrant reduction.

Under the First Step Act of 2018, federal prisoners may now petition courts directly for reduction of their sentences, and judges may grant such requests if "extraordinary and compelling reasons" support reduction. See First Step Act of 2018, Section 603(b), Pub. L. 115- 391, 132 Stat. 5194 (2018) (amending 18 U.S.C. § 3582(c)(1)(A)(i)). Previously, courts could modify

sentences under § 3582(c)(1)(A)(i) only upon motion of the BOP Director. Since the First Step

Act was enacted, courts have granted relief under § 3582(c)(1)(A)(i) in numerous cases. Here, the

Court has the authority to modify Mr. Smith's sentence because "extraordinary and compelling"

circumstances are present.

A. The history of 18 U.S.C. § 3582(c)(1)(A)(i) explains the underpinnings of the authority
   currently delegated to courts.

Congress first enacted the modern form of the compassionate release statute, codified at 18

U.S.C. § 3582, as part of the Comprehensive Crime Control Act of 1984. Section 3582(c) states

that a sentencing court can reduce a sentence whenever "extraordinary and compelling reasons

warrant such a reduction." 18 U.S.C. § 3582(c)(1)(A)(i). In 1984, Congress conditioned the

reduction of sentences on the BOP Director's filing of an initial motion to the sentencing court.

Absent such a motion, sentencing courts had no authority to modify a prisoner's sentence for

compassionate release. Id.

Although BOP was first authorized to file compassionate-release motions in 1984, BOP

almost never did so. Order, United States v. Rodriguez, No. 2:03-cr-00271-AB-1, Doc. # 135

(E.D.P.A. April 1, 2020) (attached as Exhibit B). From 1984 to 2013, an average of only 24

inmates were released each year through BOP-filed motions. Id. (citing Hearing on Compassionate

Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n (2016) (statement

of Michael E. Horowitz, Inspector General, Dep't of Justice)). BOP's failure was multifaceted;

according to a 2013 report by the Inspector General, BOP's "compassionate release program had

been poorly managed and implemented inconsistently, . . . resulting in eligible inmates  . . . not

being considered for release, and terminally ill inmates dying before their requests were decided."

Id. The same report found that the BOP "did not have clear standards as to when compassionate

release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release."  Id.

It was in order to make compassionate release available that Congress intervened in the compassionate release process by passing the First Step Act, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of prisoners and unwind decades of mass incarceration."  Id. (citing Brown, 411 F. Supp.3d at 448 (citing Cong. Research Serv., R45558, First Step Act of 2018:  An Overview 1 (2019)).  The First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.  Congress made this change in § 603(b) of the First Step Act, titled "Increasing the Use and Transparency of Compassionate Release." Section 603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'"  Id. (citing Brown, 411 F. Supp.3d at 451 (quoting Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018))).  With the First Step Act, Congress intended to expand the use of compassionate release and labeled the changes to § 3582(c)(1)(A), "Increasing the Use and Transparency of Compassionate Release."[1] There is no indication that Congress has ever intended to limit sentence modification to cases involving elderly prisoners or those with medical needs.  Indeed, the only limitation that Congress has placed on a court's discretionary sentence modification authority is that "[r]ehabilitation of the defendant alone shall not be considered an extraordinary and compelling reason."  28 U.S.C. § 994(t).

---

[1] 164 Cong. Rec. H10358 (daily ed. Dec. 20, 2018).  Senator Cardin observed that the First Step Act "expands compassionate release" and "expedites compassionate release applications."  164 Cong. Rec. S7774 (daily ed. Dec. 18, 2018); see also Hopwood, supra note 2, at 106-07 (discussing legislative history of First Step Act).

Although Congress has never defined what constitutes an "extraordinary and compelling reason" for resentencing under Section 3582(c), the legislative history to the statute gives an indication of how Congress thought the statute should be employed. When first discussing the purposes of the statute in 1983, the Senate Committee stressed how some individual cases, even after the abolishment of federal parole, still may warrant a second look at resentencing:

> The Committee believes that there may be unusual cases in which an eventual reduction in the length of a term of imprisonment is justified by changed circumstances. These would include cases of severe illness*, cases in which other extraordinary and compelling circumstances* justify a reduction of an unusually long sentence, and some cases in which the sentencing guidelines for the offense of which the defendant was convicted have been later amended to provide a shorter term of imprisonment.

S. Rep. No. 98-225, at 55-56 (1983) (emphasis added). Congress intended that the circumstances listed in § 3582(c) would act as "safety valves for modification of sentences," id. at 121, enabling judges to provide second looks for possible sentence reductions when justified by various factors that previously could have been addressed through the abolished parole system. This safety valve statute would "assure the availability of specific review and reduction of a term of imprisonment for 'extraordinary and compelling reasons' and [would allow courts] to respond to changes in the guidelines." Id. Noting that this approach would keep "the sentencing power in the judiciary where it belongs," rather than with a federal parole board, the statute permitted "later review of sentences in particularly compelling situations." Id. (emphasis added).

With the 1984 legislation, Congress directed the Sentencing Commission to promulgate general policy statements regarding the sentencing modification provisions set forth in § 3582(c). See 28 U.S.C. § 994(a)(2)(C), (t). Although the Sentencing Commission took decades to do so (waiting from 1984 until 2007), it eventually promulgated 1B1.13 to provide guidance in compassionate release cases. The latest version of the Commission's policy statement, adopted in

2016, was intended to broaden eligibility criteria and encourage the BOP Director to file motions when extraordinary and compelling circumstances are present.  <u>See</u> U.S.S.G. § 1B1.13 & Amendment 799.

The Commission's policy statement provides that a sentence reduction for "extraordinary and compelling reasons" must be accompanied by a finding by the court that the person is "not a danger to the safety of any other person or to the community."  U.S.S.G. § 1B1.13(2).  Reasons supporting a reduction may include the defendant's medical condition, age, or family circumstances, but also "other reasons" that are "extraordinary and compelling."  U.S.S.G. § 1B1.13, cmt 1.  This final "other reasons" category specifically includes "an extraordinary and compelling reason other than, or in combination with," the other three circumstances listed (i.e., medical condition, age, or family circumstances).  The policy does not prohibit consideration of a prisoner's rehabilitation, but provides that "[p]ursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement."  U.S.S.G. § 1B1.13, cmt. 3.  In addition, the policy clarifies that "an extraordinary and compelling reason need not have been unforeseen at the time of sentencing in order to warrant a reduction in the term of imprisonment," and thus, "the fact that an extraordinary and compelling reason reasonably could have been known or anticipated by the sentencing court does not preclude consideration for a reduction under this policy statement."  <u>Id.</u>, cmt. 2.  Finally, the policy encourages the BOP Director to file motions when extraordinary and compelling circumstances are present and recognizes that the "court is in a unique position to determine whether the circumstances warrant a reduction (and, if so, the amount of reduction), after considering the factors set forth in 18 U.S.C. § 3553(a) and the criteria set forth in this policy statement, such as

the defendant's medical condition, the defendant's family circumstances, and whether the defendant is a danger to the safety of any other person or to the community." Id. cmt. 4.

Although the Commission's policy statement provides that a BOP motion is required for sentence modification, courts have found this provision inoperable given that the First Step Act eliminated the requirement of a BOP motion.[2] See, e.g., United States v. Cantu-Rivera, No. CR H-89-204, 2019 WL 2578272, at *2 n.1 (S.D. Tex. June 24, 2019) ("Because the current version of the Guideline policy statement conflicts with the First Step Act, the newly-enacted statutory provisions must be given effect."); accord United States v. Maumau, No. 2:08-CR-00758-TC-11, 2020 WL 806121, at *2 (D. Utah Feb. 18, 2020) (collecting cases). Indeed, because the Commission has not amended the 2016 policy statement since Congress passed the First Step Act in 2018, "[t]here is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act." United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *13 (M.D.N.C. June 28, 2019). Thus, "[w]hile the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)." Id.; see also United States v. Bradshaw, No. 1:15-CR-422, 2019 WL 7605447, at *3 (M.D.N.C. Sept. 12, 2019) (noting that "there is no policy statement applicable to a defendant's motion for compassionate release which constrains the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)," but observing that the "old policy statement does provide some assistance"); United States v.Cantu, No. 1:05-CR-458-1, 2019 WL 2498923, at *4 (S.D. Tex. June 17, 2019) ("Given the changes to the statute, the policy-statement provision that was previously applicable to 18 U.S.C.

---

[2] Some courts have referred to this as a "lack" of an applicable policy statement.

§ 3582(c)(1)(A) no longer fits with the statute and thus does not comply with the congressional mandate that the policy statement must provide guidance on the *appropriate use* of sentence-modification provisions under § 3582.") (emphasis in original).  Similarly, in <u>Redd</u>, the court noted that § 1B1.13 "by its terms applies only to motions for compassionate release filed by the BOP Director, not motions filed by defendants."  2020 WL 1248493, at *6 (E.D. Va. Mar. 16, 2020).  Therefore, the court concluded, "there does not currently exist, for the purposes of satisfying the First Step Act's 'consistency' requirement, an 'applicable policy statement.'"  <u>Id.</u> Courts must therefore independently determine whether extraordinary and compelling reasons warrant sentence reduction.

The government conceded this point in <u>United States v. Young</u>, agreeing that, "the dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."  No. 2:00-CR-00002-1, 2020 WL 1047815, at *2 (M.D. Tenn. Mar. 4, 2020).  Moreover, the Court in <u>Young</u> followed the majority of district courts in recognizing that § 1B1.13's defined categories are not exclusive:  "In short, federal judges are no longer constrained by the BOP Director's determination of what constitutes extraordinary and compelling reasons for a sentence reduction."  <u>Id.</u> at *6.[3]

---

[3] <u>See also</u> <u>United States v. O'Bryan</u>, No. 96-10076-03-JTM, 2020 WL 869475, at *2 (D. Kan. Feb. 21, 2020); <u>United States v. Maumau</u>, No. 2:08-cr-00758-TC-11, 2020 WL 806121, at *2-3 ("[A] majority of district courts to consider the question have embraced Mr. Maumau's position" that limiting the catch-all provision to circumstances identified by the BOP is inconsistent with the law") (citing ten other cases); <u>Brown</u>, 411 F. Supp.3d at 451 ("[I]f the [First Step Act] is to increase the use of compassionate release, the most natural reading of the amended § 3582(c) and § 994(t) is that the district court assumes the same discretion as the BOP Director when it considers a compassionate release motion properly before it. . . . Thus, the Director's prior interpretation of 'extraordinary and compelling' reasons is informative, but not dispositive." (internal quotation marks and citations omitted)); <u>United States v. Beck</u>, No. 1:13-CR-186-6, 2019 WL 2716505, at *5-6 (M.D.N.C. June 28, 2019) ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3582(c)(1)(A)(i)."  (internal citation omitted)).

B. The Court may reduce Mr. Smith's term of imprisonment based on its own determination of extraordinary and compelling reasons.

The First Step Act grants sentencing courts authority to reduce an otherwise final term of imprisonment for "extraordinary and compelling reasons."  18 U.S.C. § 3582(c)(1)(A)(i).  The statute provides:

(1) in any case--

(A) **the court**, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier, **may reduce the term of imprisonment** (and may impose a term of probation or supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment), **after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that**--

(i) **extraordinary and compelling reasons warrant such a reduction**;…

*****

**and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission**.

18 U.S.C. § 3582(c)(1)(A)(i).  Thus, the statutory requirements for sentence reduction are that the court (1) find extraordinary and compelling reasons for the reduction, (2) consider the relevant sentencing factors under 18 U.S.C. § 3553(a), and (3) ensure any reduction is consistent with applicable policy statements.

When Congress first created compassionate release in 1984, Congress also delegated to the Sentencing Commission authority to "describe what should be considered extraordinary and compelling reasons for sentence reduction, including the criteria to be applied, and a list of specific examples."  28 U.S.C. § 994(t).  The Guidelines issued in exercise of that authority, U.S.S.G. § 1B1.13, provides:

Upon motion of the Director of the Bureau of Prisons under 18 U.S.C. § 3582(c)(1)(A), the court may reduce a term of imprisonment (and may impose a term of supervised release with or without conditions that does not exceed the unserved portion of the original term of imprisonment) if, after considering the factors set forth in 18 U.S.C. § 3553(a), to the extent that they are applicable, the court determines that—

    (1)    (A)    extraordinary and compelling reasons warrant the reduction; or

            (B)    the defendant (i) is at least 70 years old; and (ii) has served at least 30 years in prison pursuant to a sentence imposed under 18 U.S.C. § 3559(c) for the offense or offenses for which the defendant is imprisoned;

    (2)    the defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g); and

    (3)    the reduction is consistent with this policy statement.

The Guideline provides examples of "extraordinary and compelling reasons" only in the application notes. The examples generally fall into four categories based on a defendant's (1) terminal illness; (2) debilitating physical or mental health condition; (3) advanced age and deteriorating health in combination with the amount of time served; or, (4) compelling family circumstances. U.S.S.G. § 1B1.13 comment. n.1(A)-(C).

The commentary also includes a fifth catch-all provision for "extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C)" as determined by the Director of the Bureau of Prisons. U.S.S.G. § 1B1.13, comment. n. 1(D).

With the changes made to the compassionate release statute by the First Step Act, courts need not await a motion from the Director of BOP to resentence prisoners under 18 U.S.C. § 3582(c)(1)(A)(i) for "extraordinary and compelling reasons." Moreover, the reasons that can justify resentencing need not involve only terminal illness, disability, or urgent dependent care for minor children. Instead, courts around the country are finding that "extraordinary and compelling" reasons include the impact of the global pandemic on vulnerable defendants.

### 1. Courts found extraordinary and compelling reasons warranting relief prior to COVID-19.

Since the First Step Act was enacted in December 2018, and prior to the COVID-19 pandemic, courts have concluded that "extraordinary and compelling reasons" warranted relief in numerous cases under § 3582(c)(1)(A)(i). As of February 24, 2020, the Bureau of Prisons reported 144 cases where sentences have been reduced under this provision. See Federal Bureau of Prisons, First Step Act, https://www.bop.gov/inmates/fsa/.

Written opinions available on Westlaw show that courts are granting relief on a variety of grounds. Some cases have focused particularly on the medical condition of the petitioner. See, e.g., United States v. Larry, No. 1:16-cr-0069 LJO, 2019 WL 4834850 (E.D. Cal., Oct. 1, 2019) (finding "extraordinary and compelling reasons" warranting relief under the First Step Act because the petitioner is "suffering from serious chronic medical conditions" which have "diminish[ed] his ability to provide self-care within the environment of a correctional facility" and because the petitioner "is not a danger to the safety of any other person or to the community"); United States v. Bradshaw, No. 2:05-cr-17-01, 2019 WL 7605447 (M.D.N.C., May 15, 2019) (finding the petitioner's diagnosis of "stage IV metastatic prostate cancer that ha[s] spread to his bones" qualifies as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act, noting that petitioner "has served approximately 37 months of his 72-month sentence" and because "[t]here is nothing in the record to indicate that he has had any disciplinary violations or infractions while in BoP's custody"); United States v. Gasich, No. 2:14-cr-63, 2019 WL 4261614 (N.D. Ind., Sept. 9, 2019) (finding the petitioner's diagnosis of "Stage 4 metastatic breast cancer" qualifies as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act); United States v. Maria Del Carmen Romero, No. EP-13-CR-01649-4-FM, 2020 WL 364275, at *3 (W.D. Tex. Jan. 21, 2020) (denying government's motion to reconsider court's grant of relief,

noting that "Romero suffers from a serious condition that qualifies as an extraordinary and compelling reason to warrant compassionate release"); United States v. Ebbers, No. S402CR11443VEC, 2020 WL 91399, at *8 (S.D.N.Y. Jan. 8, 2020) (concluding that a rapid medical decline, coupled with prisoner's age, present extraordinary and compelling reasons for release); United States v. Schmitt, No. CR12- 4076-LTS, 2020 WL 96904, at *4 (N.D. Iowa. Jan. 8, 2020) (granting relief to a prisoner "suffering from a terminal illness, stage four metastatic breast cancer that is spreading to other parts of her body"); United States v. York, No. 3:11-CR-76, 2019 WL 3241166, at *6 (E.D. Tenn. July 18, 2019) (concluding that prisoner's "combination of medical conditions, but particularly his heart condition, to be extraordinary or compelling reasons justifying a sentence reduction"); United States v. Bellamy, No. CV151658JRTLIB, 2019 WL 3340699, at *1 (D. Minn. July 25, 2019) ("The Court will find that extraordinary and compelling circumstances warrant compassionate release in Bellamy's case due to his serious and worsening health problems."); United States v. Karr, No. 6:17-CR-25-REW, 2020 WL 774363, at *9 (E.D. Ky. Feb. 18, 2020) (granting relief based on medical condition and rehabilitation); United States v. Wong Chi Fai, No. 93-CR-1340 (RJD), 2019 WL 3428504, at *3 (E.D.N.Y. July 30, 2019) (granting relief to defendant sentenced to life who had "experienced a 'serious deterioration' in his physical health"); United States v. Spears, No. 3:98-CR-0208-SI-22, 2019 WL 5190877, at *4 (D. Or. Oct. 15, 2019) (granting relief based on age and medical conditions). Some cases have stressed the BOP's failure to provide adequate medical care in concluding that extraordinary and compelling circumstances warrant relief. See, e.g., United States v. Beck, No. 1:13-CR-186-6, 2019 WL 2716505, at *13 (M.D.N.C. June 28, 2019) (concluding that "[i]nvasive cancer and the abysmal health care provided by BoP qualify as extraordinary and compelling reasons warranting a reduction in her sentence to time served").

In granting relief, courts have also considered changes in sentence policy since the defendant was originally sentenced. See, e.g., Maumau, 2020 WL 806121, at *7 ("Based on the above, the court concludes that a combination of factors—Mr. Maumau's young age at the time of the sentence, the incredible length of the mandatory sentence imposed, and the fact that, if sentenced today, he would not be subject to such a long term of imprisonment—establish an extraordinary and compelling reason to reduce Mr. Maumau's sentence."); United States v. Urkevich, No. 8:03CR37, 2019 WL 6037391 (D. Neb. Nov. 14, 2019) (reducing sentence where the petitioner "poses no current danger" and reduction "is warranted by extraordinary and compelling reasons, specifically the injustice of facing a term of incarceration forty years longer than Congress now deems warranted for the crimes committed"); Cantu-Rivera, 2019 WL 2578272, at *4 (granting relief to petitioner serving life sentence based on "fundamental change to sentencing policy carried out in the First Step Act's elimination of life imprisonment as a mandatory sentence solely by reason of a defendant's prior convictions" in combination with other factors including the petitioner's "extraordinary degree of rehabilitation, age, and medical condition").

In addition, courts have considered a combination of factors including rehabilitation, acceptance of responsibility, and the petitioner's ability to care for his family and help society outside of prison. See, e.g., United States v. Walker, No. 1:11 CR 270, 2019 WL 5268752 (N.D. Ohio Oct. 17, 2019) (concluding that the petitioner's "history; the circumstances leading up to his crime; his acceptance of responsibility not just with regard to the conviction but as demonstrated through the meaningful use of his time in prison; the failing health of his mother; his extraordinary job opportunity and the good that would allow him to do for his family and his community; and, the minimum time left remaining on his sentence" qualify as "extraordinary and compelling

reasons" warranting relief pursuant to the First Step Act); United States v. Bucci, No. 04-10194-WGY, 409 F. Supp.3d 1 (D. Mass. Sept. 16, 2019) (concluding that the petitioner's "role as the only potential caregiver for his ailing mother" coupled with the existence of the petitioner's "rehabilitation through his substantial time in prison" which has included "devoting much of his time to care for terminally ill inmates" qualify as "extraordinary and compelling reasons" warranting relief pursuant to the First Step Act).

### 2. Courts have found extraordinary and compelling reasons warranting relief in the wake of the COVID-19 pandemic.

Finally, since the COVID-19 pandemic, courts have extraordinary and compelling reasons warranting relief where a defendant presents evidence of a pre-existing condition making him more vulnerable to COVID-19 in combination with the increased risks of COVID-19 in prisons. See, e.g., Order, United States v. Perez, No. 1:17-cr-513-AT, Doc. # 98 (S.D.N.Y. April 1, 2020) (attached to Reply at Exhibit C); Order, United States v. Rodriguez, No. 2:03-cr-00271-AB-1, Doc. # 135 (E.D.P.A. April 1, 2020) (attached to Reply Brief as Exhibit E); Amended Order, United States v. Powell, No. 1:94-cr-316-ESH, Doc. # 98 at *1 (D.D.C. Mar. 28, 2020) (granting motion for compassionate release for 55-year-old defendant with asthma and sleep apnea in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust administrative remedies); Order, United States v. Campagna, No. 16 Cr. 78-01, 2020 WL 1489829, at *3 (S.D.N.Y. Mar. 27, 2020); Order, United States v. Copeland, No. 2:05-cr-135-DCN, Doc. # 662 at 9 (D.S.C. Mar. 24, 2020) (granting compassionate release to defendant in part due to "Congress's desire for courts to release individuals the age defendant is, with the ailments that defendant has during this current pandemic").

Accordingly, this Court has authority to consider whether the worsening global pandemic, combined with the other relevant circumstances in this case, including Mr. Smith's age and pre-

existing medical conditions of COPD, asthma, and history of lung disease (pneumonia and infection) present an extraordinary and compelling basis for a sentence reduction, regardless of whether BOP moves for compassionate release or whether the request falls within one of the existing categories in § 1B1.13 commentary.

**III.**     **Mr. Smith's vulnerability to COVID-19 is an extraordinary and compelling reason for a reduction in sentence to time served.**

Mr. Smith is eligible for compassionate release on two bases. First, extraordinary and compelling reasons for modification exists because he is suffering from a "serious physical or medical condition…that substantially diminishes the ability to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover." U.S.S.G. § 1B1.13 comment n.1(A)(ii). <u>See, e.g.</u>, Order, <u>United States v. Zukerman</u>, 16cr194 (Torres, J.), doc. # 116 (finding exhaustion excused and extraordinary and compelling reasons warranted for sentence reduction based on combination of serious physical/medical condition and COVID-19). Second, U.S.S.G. § 1B1.13 comment. n.1(D) authorizes release based on "an extraordinary and compelling reason other than, or in combination with, the [other] reasons described."

A.     <u>Mr. Smith's deteriorating medical condition is an extraordinary and compelling reason for a sentence reduction.</u>

Mr. Smith suffers from Myotonic Muscular Dystrophy Type 1 ("DM1"), a severe and progressively debilitating genetic disorder that leads to shortened life expectancy. PSR ¶ 72. DM1 is a multisystem disorder that affects Mr. Smith's skeletal muscle, cardiac system, respiratory system, gastrointestinal system, brain, central nervous system, hormones, and vision. <u>Id.</u>

Mr. Smith's cardiac and respiratory conditions are documented in his PSR and original sentencing memorandum. In 2001, at Flagstaff Medical Center, he was diagnosed with first degree atrial ventricular block and possible bundle branch block, attributable to his DM1. PSR ¶ 72. A

2016 EKG exam at Wyatt Detention Center in Rhode Island showed that Mr. Smith's heart condition had worsened to a complete block. The doctor who interpreted the EKG stated that Mr. Smith's condition is deteriorating and he will eventually require a pacemaker. Defendant's Sentencing Memo at *26-27.

The PSR also describes Mr. Smith as having "difficulty breathing," a common symptom of DM1, and a result of weakening respiratory muscles. PSR ¶ 73. At Mr. Smith's sentencing, his sister, Carrie Wenzel, spoke and explained that, "Nate also is prone to getting sick a lot and a typical cold can very quickly turn into pneumonia. And when he was living with me, this did happen a couple of times, and I would have to wake him up and remind him to eat, drink, and to take his medication." Sentencing Transcript 4/7/17, at 135. Ms. Wenzel continued, "Your Honor, I'm telling you all this because I do want you to know that Nathan is severely affected by DM1. The thought of Nathan in prison is heartbreaking. And I do understand that his offense is inappropriate. But I do have a deep fear that he will be brutally injured, killed or die from DM1 complications." Id.

Mr. Smith's disease has been progressing while he has been incarcerated. He continues to suffer from shortness of breath, but has also developed pain and muscle weakness in his legs and is only able to walk with a cane. Patients with DM1 often suffer from difficulties with lower extremity motor control.[4] Mr. Smith has fallen at least six times since being incarcerated, and on one occasion, he split open his lip. When he is subject to body searches, he is unable to support his own weight on one foot and correctional officers must physically hold him up. Because of his muscle weakness, it is difficult for him to get out of bed. It takes him at least five minutes to move from a reclining to a standing position with the assistance of his cane. When using the toilet and

---

[4] Lower Extremity Motor Control in DM1, available at https://www.myotonic.org/lower-extremity-motor-control-dm1.

shower, he must lean against the wall to avoid falling. His movements are generally slow, which means that he is unable to finish eating his food in the allotted time and usually is not able to finish eating.

Mr. Smith's physical vulnerability is further complicated by his cognitive limitations. His IQ is in the low 80s. PSR ¶ 79. His "adaptive functioning"—a measure of how well a person can perform the everyday tasks of life[5]—is in the bottom one-half of the first percentile of the population (specifically, the lowest 0.4% of the overall population). As a result, he has an impaired ability to navigate the BOP health system, including advocating for necessary safeguards and treatments and then complying with the recommendations. As his sister explained at sentencing, she had to "remind him to eat, drink, and to take his medication." Sentencing Transcript 4/7/17, at 135.

Mr. Smith's cardiac and respiratory conditions put his life gravely at risk from COVID-19. Pre-existing cardiac and respiratory conditions are both on the list of conditions that put "People at Risk for Serious Illness from COVID-19" as defined by the Centers for Disease Control (CDC).[6] Myotonic, an advocacy organization for those suffering from DM, issued an advisory explaining that DM patients should be vigilant in protecting against COVID-19. Exhibit C. Myotonic also explained that DM patients with respiratory issues who contract COVID-19 may require

---

[5] <u>Mental Retardation: Determining Eligibility for Social Security Benefits</u>, ch.4 at 143 (Christine R. Hartel, Tracy G. Myers & Daniel J. Reschly eds., 2002).
[6] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-at-higher-risk.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fspecific-groups%2Fhigh-risk-complications.html

specialized treatment.[7]  Exhibit D.  Myotonic is advising that DM patients may require not only ventilators, but additional oxygen supports.[8]

The WHO-China Joint Mission Report provided historical mortality rates for those who contracted COVID-19 with specific pre-existing conditions.  For those with cardiovascular disease, the mortality rate was 13.2%.  For those with chronic respiratory disease, the mortality rate was 8.0%.[9]  Many patients with pre-existing conditions who developed severe COVID-19 and did not die, still faced prolonged recovery periods, including extensive rehabilitation from neurologic damage, loss of digits, and loss of respiratory capacity, all of which are likely to render Mr. Smith unable to independently function within the prison.  Id.

The CDC recommends that high-risk people, such as Mr. Smith, take specific steps to avoid infection, and Myotonic echoes those recommendations for DM patients.[10]  Exhibit C.  The recommendations include cleaning your hands often, avoiding close contact with others, and cleaning and disinfecting surfaces regularly.[11]  However, Mr. Smith is unable to comply with the CDC recommendations because of prison conditions.  All BOP inmates are currently on lockdown,[12] which means that Mr. Smith exits his cell for one hour a day.  During the one hour

---

[7] Pulmonary Support for Myotonic Dystrophy Patients During Covid-19 Pandemic, available at https://www.myotonic.org/sites/default/files/pages/files/Pulmonary-Support-for-Myotonic-Dystrophy-Patients-During-COVID-19-Pandemic-20200-3-23.pdf.

[8] Id.

[9] Report of the WHO-China Joint Mission on Coronavirus Disease 2019 (COVID-19), World Health Organization (Feb. 28, 2020), at 12, https://www.who.int/docs/default-source/coronaviruse/who-china-joint-mission-on-covid-19-final-report.pdf (finding fatality rates for patients with COVID-19 and co-morbid conditions to be: "13.2% for those with cardiovascular disease, 9.2% for diabetes, 8.4% for hypertension, 8.0% for chronic respiratory disease, and 7.6% for cancer").

[10] A Message from Myotonic's CEO About COVID-19, available at https://www.myotonic.org/message-myotonics-ceo-about-covid-19 and attached.

[11] CDC, How to Protect Yourself, available at https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/prevention.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fcoronavirus%2F2019-ncov%2Fprepare%2Fprevention.html

[12] BOP Press Release, COVID-19 Action Plan: Phase V, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

outside of his cell, he is in a shared area with 35 other inmates.  During that one-hour period, inmates are also allowed to use the phone and shower.  BOP has instructed the inmates to wipe the phone down themselves with a rag that sits by the phone.  The same rag is used every time to wipe the phone.  The shower is cleaned once a day, and not between uses.  BOP is not providing soap and sanitizer free of charge; instead, both must be purchased at commissary and as a result, are not available to all inmates.

     B.      <u>COVID-19 is an unprecedented and rapidly-expanding global health emergency that is spreading in prisons, which in combination with Mr. Smith's DM1 condition, make him particularly susceptible to sickness and increased risk of death.</u>

In recent months, COVID-19 has spread across the globe and throughout the United States. As of April 4, 2020, COVID-19 has sickened over 1,182,000 people, leading to at least 63,000 deaths worldwide.[13]  The United States has become the epicenter of the crisis, with 275,000 cases and 7,800 deaths thus far.[14]  On March 11, 2020, the World Health Organization officially classified COVID-19 as a pandemic.[15]  President Trump has declared a national emergency,[16] and his administration states that even if all precautions are followed, there is an estimated death toll in the United States of 100,000 to 240,000 people.[17]

---

[13] <u>Coronavirus Map: Tracking the Global Outbreak</u>, N.Y. TIMES (updated daily), https://www.nytimes.com/interactive/2020/world/coronavirus-maps.html (last visited Apr. 4, 2020).

[14] <u>Coronavirus in the U.S.: Latest Map and Case Count</u>, N.Y. TIMES (updated daily), https://www.nytimes.com/interactive/2020/us/coronavirus-us-cases.html (last visited Apr. 4, 2020).  These numbers almost certainly underrepresent the true scope of the crisis; test kits in the United States have been inadequate to meet demand.

[15] Press Release, World Health Organization, WHO Director-General's opening remarks at the media briefing on COVD-19 – 11 March 2020, (March 11, 2020), <u>available at</u> https://www.who.int/dg/speeches/detail/who-director-general-s-opening-remarks-at-the-media-briefing-on-covid-19---11-march-2020.

[16] Priscilla Alvarez, <u>Here's What Trump's Coronavirus Emergency Declaration Does</u>, CNN (Mar. 13, 2020 5:59), https://www.cnn.com/2020/03/13/politics/states-coronavirus-fema/index.html.

[17] White House Task Force Projects 100,000 to 240,000 Deaths Within U.S., Even with Mitigation, https://www.washingtonpost.com/world/2020/03/31/coronavirus-latest-news/.

The CDC advises that the coronavirus is "spread mainly from person-to-person . . . [b]etween people who are in close contact with one another . . . [t]hrough respiratory droplets produced when an infected person coughs or sneezes."[18] The droplets can land in the mouths or noses, or can be inhaled into the lungs, of people who are within about six feet of the infected person.[19] The coronavirus is highly contagious and those who are infected, can spread the virus even if they are asymptomatic.[20] Additionally, studies have shown that the coronavirus can survive from three hours to three days on various surfaces.[21] At this time, there is no known treatment, vaccine, or cure for COVID-19.[22]

Although there are currently no reported cases at USP Marion, where Mr. Smith is serving his sentence, COVID-19 cases have already been confirmed at multiple BOP facilities and with every day that passes, BOP identifies additional cases at additional institutions.[23] As of April 2, 2020, BOP has identified 91 inmate cases and 50 staff cases.[24] As the Court noted in United States v. Caddo, "it is unknowable whether BOP detainees or inmates have Covid-19 until they are tested, and BOP has not conducted many or any such tests because, like the rest of the country, BOP has very few or no actual Covid-19 test packets." Order at 5, United States v. Caddo, No. 3:18-cr-08341-JJT (D. Ariz. Mar. 23, 2020). One BOP inmate who fell ill on March 19, 2020, has died

---

[18] CDC, Coronavirus Disease 2019 (COVID-19), How It Spreads, March 4, 2020, https://www.cdc.gov/coronavirus/2019-ncov/prepare/transmission.html.

[19] Id.

[20] Marco Cascella et al., Features, Evaluation and Treatment Coronavirus (COVID-19), National Center for Biotechnology Information ("NCBI"), March 20, 2020, https://www.ncbi.nlm.nih.gov/books/NBK554776/#_ncbi_dlg_citbx_NBK554776.

[21] National Institute of Allergy and Infectious Diseases, New coronavirus stable for hours on surfaces, March 17, 2020, https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces ("[S]cientists [from the National Institutes of Health, CDC, UCLA and Princeton University] found that [coronavirus] was detectable in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel.").

[22] CDC, Coronavirus Fact Sheet, March 20, 2020, https://www.cdc.gov/coronavirus/2019-ncov/downloads/2019-ncov-factsheet.pdf.

[23] https://www.bop.gov/coronavirus/ (updated daily)

[24] Id.

from the disease.  He was 49 years old. [25]  As of April 3, 2020, seven inmates have died in BOP custody.

Because transmission may happen asymptomatically, BOP is quarantining inmates even in institutions where there are no positive cases.  The Centers for Disease Control ("CDC") now warns that as many as 25 percent of people infected with the virus have no symptoms, would not be tested for the virus, and may be "unwitting spreaders."[26]  Dr. Jeffrey Shaman, an infectious disease expert at Columbia University, explains:  "The bottom line is that there are people out there shedding the virus who don't know that they're infected."[27]

Alarmingly, the Marshall Project recently reported that staff at the BOP facility at Oakdale were told to report to work, even if they had exposure to individuals who tested positive for COVID-19, as long as they were not symptomatic. [28]

BOP recognizes that the pandemic is spreading within its institutions.  On March 26, 2020, the Attorney General sent a memo to the Director of BOP "directing [him] to prioritize the use of [his] various statutory authorities to grant home confinement for inmates seeking transfer in connection with the COVID-19 pandemic."[29]  The Attorney General specifically recognized that "there are some at-risk inmates who are non-violent and pose minimal likelihood of recidivism and who might be safer serving their sentences in home confinement rather than BOP facilities."

---

[25]     https://www.nytimes.com/reuters/2020/03/28/us/28reuters-heath-coronavirus-prison-death.html.

[26]     Apoorva Mandavilli, Infected but Feeling Fine: The Unwitting Coronavirus Spreaders, N.Y. TIMES (April 1, 2020), available at https://www.nytimes.com/2020/03/31/health/coronavirus-asymptomatic-transmission.html?action=click&module=Top%20Stories&pgtype=Homepage.

[27]     Id.
[28]     https://www.themarshallproject.org/2020/04/03/federal-prisons-agency-put-staff-in-harm-s-way-of-coronavirus

[29]     Memo from Attorney General to Director of Bureau of Prisons, March 26, 2020, https://www.politico.com/f/?id=00000171-1826-d4a1-ad77-fda671420000.

Id.  On April 30, 2020, BOP took the extreme step of placing all inmates in all facilities on lockdown, such that all inmates are confined 24 hours a day to their cells or quarters.[30]

Jails and prisons are among the most dangerous places to be during an epidemic because they create the ideal environment for transmission of contagious diseases.[31]  The attached expert declaration of Dr. Jaime Meyer explains the particular risks of contagious diseases in prison. Exhibit E (expert declaration of Dr. Jaime Meyer, Yale Law School Liman Center Affiliate, filed in numerous cases).  Inmates are confined in close proximity and the staff leave and return daily. Incarcerated individuals "are at special risk of infection, given their living situations," and "may also be less able to participate in proactive measures to keep themselves safe;" "infection control is challenging in these settings," according to public health experts.[32]  Jails and prisons are sites of disproportionate infectious disease rates.[33]  Outbreaks of the flu regularly occur in jails, and during the H1N1 epidemic in 2009, many jails and prisons dealt with high numbers of cases. [34]  In China, officials have confirmed the coronavirus spreading rapidly in Chinese prisons, counting 500 cases.[35]  Secretary of State Mike Pompeo has called for Iran to release Americans detained there because of the "deeply troubling" "[r]eports that COVID-19 has spread to Iranian prisons," noting

---

[30] BOP Press Release, COVID-19 Action Plan: Phase V, available at https://www.bop.gov/resources/news/20200331_covid19_action_plan_5.jsp

[31] Joseph A. Bick, Infection Control in Jails and Prisons, 45 CLINICAL INFECTIOUS DISEASES 8, 1047-1055 (Oct. 15, 2007), available at https://doi.org/10.1086/521910.

[32] "Achieving A Fair And Effective COVID-19 Response: An Open Letter to Vice-President Mike Pence, and Other Federal, State, and Local Leaders from Public Health and Legal Experts in the United States," (March 2, 2020), available at  https://bit.ly/2W9V6oS.

[33] Leonard S. Rubenstein, et al., HIV, Prisoners, and Human Rights, LANCET (July 14, 2016), https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(16)30663-8/fulltext.

[34] Prisons and Jails are Vulnerable to COVID-19 Outbreaks, THE VERGE (Mar. 7, 2020), https://bit.ly/2TNcNZY.

[35] Rhea Mahbubani, Chinese Jails Have Become Hotbeds of Coronavirus As More Than 500 Cases Have Erupted, Prompting the Ouster of Several Officials, BUS. INSIDER (Feb. 21, 2020, 5:11 PM), https://www.businessinsider.com/500-coronavirus-cases-reported-in-jails-in-china-2020-2.

that "[t]heir detention amid increasingly deteriorating conditions defies basic human decency."[36]

Courts across Iran have granted 54,000 inmates furlough as part of the measures to contain coronavirus across the country.[37] It was reported on March 18, that a guard at Rikers Island in New York City had tested positive for COVID-19.[38] Three days later, at least 38 people at Rikers had tested positive.[39] Despite efforts to release hundreds of detainees to try to stem the tide of infection there,[40] the virus continues to spread rapidly; as of March 30, 167 inmates, 114 correction staff, and 20 health workers had tested positive and two correction staff members had died.[41] Hundreds of detainees have been released in other jurisdictions, including 600 in Los Angeles and 300 in San Francisco.[42]

The large-scale release of detainees reflects the growing recognition that "[i]t's like an approaching tsunami. Once it hits, it's too late. . . . We should release as many as it's safe to release in order to avoid a situation like the one at Rikers."[43] "The coronavirus is invading U.S. jails and prisons, prompting inmate releases, reduced bail requirements and other extraordinary measures as officials rush to avert a potentially disastrous spread of the virus among crowded

[36] Jennifer Hansler & Kylie Atwood, Pompeo calls for humanitarian release of wrongfully detained Americans in Iran amid coronavirus outbreak, CNN (Mar. 10, 2020), https://www.cnn.com/2020/03/10/politics/mike-pompeo-iran-release-detained-americans-coronavirus/index.html.

[37] Claudia Lauer and Colleen Long, US Prisons, Jails On Alert for Spread of Coronavirus, ASSOCIATED PRESS (Mar. 7, 2020, 8:12 PM), https://apnews.com/af98b0a38aaabedbcb059092db356697.

[38] NYC Officials Call for Release of 'Most at Risk' on Rikers Island as More Test Positive for Virus, NBC N.Y., ASSOCIATED PRESS (Mar. 18, 2020), https://www.nbcnewyork.com/news/local/nyc-officials-call-for-release-of-most-at-risk-on-rikers-prison-as-more-test-positive-for-virus/2333348.

[39] 38 Positive for Coronavirus at Rikers, NYC Jails, N.Y. TIMES, ASSOCIATED PRESS (March 21, 2020), https://www.nytimes.com/aponline/2020/03/21/us/ap-us-virus-outbreak-inmates.html.

[40] Craig McCarthy, NYC To Release 300 More Rikers Inmates Admit Coronavirus Pandemic, N.Y. POST (Mar. 25, 2020 7:25 AM), https://nypost.com/2020/03/25/nyc-to-release-300-more-rikers-inmates-amid-coronavirus-pandemic/.

[41] 914 Dead in N.Y.C., and City's Virus Case Count Tops 38,000, N.Y. TIMES (Mar. 31, 2020, 7:31 a.m. ET), https://www.nytimes.com/2020/03/30/nyregion/coronavirus-new-york-update.html.

[42] 38 Positive for Coronavirus at Rikers, supra.

[43] Id.

inmate populations."[44]  As a prominent group of Yale School of Medicine "medical professionals and experts in infectious disease and/or prison populations" recently wrote to Connecticut Supreme Court Associate Justice Andrew J. McDonald, the way to safeguard inmates is to reduce jail populations now.  Exhibit F (Mar. 27, 2020 Ltr. to Justice McDonald) at * 5.  "Once a case of COVID-19 [is] identified in a facility, it will likely be too late to prevent a widespread outbreak." Id.  Two doctors who are contracted experts for the Department of Homeland Security's Office of Civil Rights and Civil Liberties said recently that COVID-19 presents an "imminent risk to the health and safety" of detainees in ICE detention centers, as well as the general public.[45]

Judges both in the District of Connecticut and around the country have released defendants because of the COVID-19 pandemic.  On March 20, 2020, Judge Meyer granted an emergency motion for temporary release from Wyatt for a 62-year-old defendant awaiting sentencing.  See United States v. Fellela, No. 3:19-CR-79-JAM, 2020 WL 1457877 (D. Conn. Mar. 20, 2020) (Meyer, J.)  In his order, Judge Meyer addressed the conditions of confinement at Wyatt:

> According to an inquiry through the U.S. Marshals Service of the Wyatt facility, there are more than 700 prisoners housed at Wyatt of which more than 500 prisoners are housed in two-person cells and more than 150 prisoners are housed in more-than-two-person cells.  There are between 20 to 70 persons at one time in general dayroom areas, and up to 15 persons are allowed in the recreation area at one time.  All levels of government nationwide have recently taken drastic measures in light of the COVID-19 pandemic to promote "social distancing" and to prohibit the congregation of large numbers of people with one another.  But, as is true for most jails and prisons, the conditions of confinement at Wyatt are not compatible with these safeguards.

Id. at *1.

---

[44] Releasing Inmates, Screening Staff: U.S. Jails and Prisons Rush to Limit Virus Risks, N.Y. TIMES, REUTERS (March 22, 2020), https://www.nytimes.com/reuters/2020/03/22/us/22reuters-health-coronavirus-usa-inmates.html (emphasis added).

[45] Catherine E. Shoichet, Doctors Warn of 'Tinderbox Scenario' if Coronavirus Spreads in ICE Detention, CNN (March 20, 2020, 8:21 PM ET), https://www.cnn.com/2020/03/20/health/doctors-ice-detention-coronavirus/index.html.

Other courts around the country have also recognized the legal significance of the pandemic. See e.g., Order on Defendant Grobman's Amended Motion for Release Pending Sentencing, United States v. Grobman, No. 1:18-cr-20989-RKA, Doc. # 397 at 2 (S.D. Fla. Mar. 29, 2020) (releasing defendant convicted after trial of fraud scheme in light of "extraordinary situation of a medically-compromised detainee being housed at a detention center where it is difficult, if not impossible, for [the defendant] and others to practice the social distancing measures which government, public health and medical officials all advocate"); United States v. Harris, No. 1:19-cr-356-RDM, 2020 WL 1482342, *1 (D.D.C. Mar. 26, 2020) ("The Court is convinced that incarcerating Defendant while the current COVID-19 crisis continues to expand poses a far greater risk to community safety than the risk posed by Defendant's release to home confinement on . . . strict conditions."); United States v. Perez, No. 19 CR. 297 (PAE), 2020 WL 1329225, *1 (S.D.N.Y. Mar. 19, 2020) (Engelmeyer, J.) (releasing defendant with "serious progressive lung disease and other significant health issues" due to the "heightened risk of dangerous complications should he contract COVID-19"); United States v. Stephens, 2020 WL 1295155, *2, __F. Supp.3d__ (S.D.N.Y. Mar. 19, 2020) (Nathan, J.) (releasing defendant in light of "the unprecedented and extraordinarily dangerous nature of the COVID-19 pandemic") (Nathan, J.); see also Minutes of [In Chambers] Invitation to File an Ex Parte Request for Reconsideration, United States v. Avenatti, No. 8:19-cr-61-JVS, Doc. # 123 (C.D. Cal. Mar. 25, 2020) (sua sponte inviting defendant to move for reconsideration of a just-denied motion for release "[i]n light of the evolving nature of the Covid-19 pandemic"). But see, United States v. Gileno, No. 3:19CR161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau

of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action.  As a result, the Court cannot consider his motion to modify his sentence.").

**IV.     A sentence of time served, along with 15 years of supervised release, is sufficient to accomplish the goals of sentencing.**

When extraordinary and compelling reasons are established, the Court must consider the relevant sentencing factors in § 3553(a) to determine whether a sentence reduction is warranted. 18 U.S.C. § 3582(c)(1)(A)(i).  Under all of the circumstances in this case, the Court should conclude that the time that Mr. Smith has already served is sufficient to satisfy the purposes of sentencing.  Under Pepper v. United States, 562 U.S. 476, 490-93 (2011), the Court can, and indeed must, consider post-offense developments under § 3553(a).

Here, the overriding factor under § 3553(a) that was not present at the time of sentencing is the COVID-19 pandemic and the serious risk it presents.  Although the circumstances of the present offense qualified Mr. Smith for the serious sentence that this Court originally imposed, the sentencing purpose of just punishment does not warrant a sentence that includes exposure to a life-threatening illness.  In fact, the Eighth Amendment's prohibition on cruel and unusual punishment includes unreasonable exposure to dangerous conditions in custody.  Helling v. McKinney, 509 U.S. 25, 28 (1993); see also Wallis v. Baldwin, 70 F.3d 1074 (9th Cir. 1995) (applying Helling to exposure to asbestos); Brown v. Mitchell, 327 F. Supp.2d 615, 650 (E.D. Va. July 28, 2004) (applying Helling to "contagious diseases caused by overcrowding conditions").  The § 3553(a) factors can be met in this case by an order of home confinement as a condition of supervised release.

Additionally, Mr. Smith's conduct while in prison, establishes that the purposes of punishment have been met.  Under Pepper, the Court must also consider "the most up-to-date picture" of the defendant's history and characteristics, which "sheds light on the likelihood that

[the defendant] will engage in future criminal conduct." Id. at 492. Mr. Smith has engaged in programming and employment. Mr. Smith has shown by his conduct and based upon his mental and physical condition, that with the proper supports and supervision, he no longer poses a threat to public safety, and that granting him compassionate release would not endanger the community.

The totality of the circumstances demonstrates that reducing Mr. Smith's sentence to time served after 50 months in custody, the equivalent of a 56-month federal sentence, and to convert the remainder of his sentence to home confinement, is "sufficient, but not greater than necessary," to serve the purposes of sentencing under § 3553(a). That sentence is punitive. Punishment is not measured in a vacuum, but as against the offender. In this case, this is Mr. Smith's only term of incarceration. Moreover, he will be on supervised release for 15 years, subject to very stringent conditions. This is a punitive sentence, especially someone with a shortened life expectancy, who may well be on supervision for the rest of his life. With regard to deterrence, Mr. Smith never served a term of incarceration before, so a sentence of time served is incrementally proportional. Moreover, since Mr. Smith's offense conduct was driven by the cognitive impairments caused by his DM1 condition, a longer sentence is not going to deter Mr. Smith. Rather, as argued at length in his original sentencing memorandum, what will deter Mr. Smith is correctly treating his DM1 condition, and providing necessary mental health counseling and related social supports. The public will be protected by a sentence that includes a long period of supervised release and stringent conditions, including GPS monitoring, prohibition on the use of the internet, and participating in mental health counseling.

Mr. Smith has a release plan to ensure his safe transition to the community. The plan is attached as Exhibit G. Upon release, Mr. Smith proposes to reside at his parent's home in Colorado. Undersigned counsel spoke Mr. Smith's stepfather, Dave Hilliard, and confirmed Mr.

Smith can reside with him and Mr. Smith's mother. Mr. Smith will voluntarily submit to home confinement and GPS monitoring. Mr. Smith would only be allowed to leave the home for probation-approved reasons, including medical and mental health care.

Mr. Smith will receive medical care from his previous primary care physician, Dr. Joel Shebowich, Smoky Hill Family Medicine, who is familiar with DM1 version of Myotonic Muscular Dystrophy. Dr. Shebowich also treated Nathaniel's grandmother, mother, and sister, all who were diagnosed with the same medical condition.

Mr. Smith will seek assistance from the Second Chance Center, a Colorado-based 501(c) (3) agency located in Aurora, Colorado. The Federal Defender Office Mitigation Specialist spoke to the Program Development Manager for the agency. She verified that the agency specifically assists formerly incarcerated men and women to integrate into society. At the Second Chance Center, they will conduct a comprehensive assessment to gauge his strengths and weaknesses and find him community resources and medical and mental health treatment providers to assist him with his needs. Due to COVID-19, the agency will conduct intakes over the phone. Case managers and other support staff are available via telephone or video conferencing. They will collaboratively work with the Colorado Coalition for Criminal Justice Reform and will work with him to obtain resources, such as the following:

- Obtain state insurance via Health First Colorado (Colorado's Medicaid Program) - a free or low-cost health and dental coverage to low-income families, children, the elderly and people with disabilities. The insurance also has providers that will cover the cost for inpatient and outpatient mental health/substance abuse treatment

- Assist to obtain birth certificate and/or Social Security Card

- Assist to obtain documents needed to determine eligibility for the Supplemental Nutrition Assistance Program (formerly known as Food Stamps)

- Assist to obtain documents needed to determine eligibility for Social Security Disability

- Individuals who express an interest in receiving vocational training and apprenticeship will be referred to local agencies who can provide job training programs overseen by case managers, as well as referrals for educational programs

Mr. Smith intends to undergo individual psychotherapy to address his diagnosis of Social Pragmatic Communication Disorder, as well as contingency management (to help with behavioral change). He also intends to enroll in programs that specialize in individualized learning style, cognitive abilities, and life experiences. Accordingly, this will allow for individual vocational and/or educational training focused on teaching life skills. The psychotherapy shall be conducted by a psychiatrist as referred by the Second Chance Center, and, approved by USPO, and Federal Defender Office working together. Mr. Smith will sign a release of information authorizing treatment staff to communicate with the United States Probation Office and the Federal Defender Office. Mr. Smith will also seek employment or a volunteer commitment suitable to his physical and mental limitations that provides him with a set schedule and responsibility.

Mr. Smith will not be permitted to access the internet, except for purposes of treatment, employment, and/or vocational training, and only through supervision by mental health providers, USPO, and others approved by the Court. He will be permitted to use a cell phone without internet capabilities.

## V.    The Court can and should waive the 30-Day requirement for exhaustion of administrative remedies under 18 U.S.C. § 3582(c)(1)(A).

Under section 3582(c)(1)(A), Mr. Smith would ordinarily be required to either wait 30 days following the warden's receipt of his compassionate release request, or exhaust all administrative remedies prior to approaching the Court, whichever happens earlier. See 18 U.S.C. § 3582(c)(1)(A). However, the Court may waive these administrative exhaustion requirements, and should do so here.

"Even where exhaustion is seemingly mandated by statute . . . , the requirement is not absolute." United States v. Perez, No. 19 CR. 297 (PAE), 2020 WL 1329225, *3 (S.D.N.Y. Mar. 19, 2020) (Engelmeyer, J.) (citing Washington v. Barr, 925 F.3d 109, 118 (2d Cir. 2019)). There are three circumstances where failure to exhaust may be excused. "First, exhaustion may be unnecessary where it would be futile, either because agency decisionmakers are biased or because the agency has already determined the issue." Id. at *4. Second, "exhaustion may be unnecessary where the administrative process would be incapable of granting adequate relief." Id. Third, "exhaustion may be unnecessary where pursuing agency review would subject plaintiffs to undue prejudice." Id.

This week, the following courts have excused the exhaustion requirements:

- United States v. Zuckerman, 16cr194, S.D.N.Y. (Torres, J.) (April 3, 2020).

- United States v. Latrice Colvin, 19cr179, D. Conn. (JBA) (April 2, 2020) (finding exhaustion waived in light of COVID-19 pandemic where exhausting administrative remedies would be futile).

- United States v. Wilson Perez, No. 1:17-cr-513, 2020 WL 1546422 (S.D.N.Y. Apr. 1, 2020) (Torres, J.) (holding that that although section 3582(c)(1)(A) imposes a "statutory exhaustion requirement" that must be "strictly enforced," that requirement is "not absolute" and can be waived under three different circumstances: (1) where exhaustion is futile "because agency decision-makers are biased or because the agency has already determined the issue," (2) because it is "unnecessary where the administrative process would be incapable of granting adequate relief," and (3) where pursuing the administrative remedy would subject the pertinent party to "undue prejudice").

- <u>United States v. Jeremy Rodriguez</u>, No. 2:03-cr-271, ECF No. 135 at 2 (E.D. Pa., April 1, 2020) (Brody, J.) (holding that Court can waive exhaustion requirements and can "independently assess" whether extraordinary and compelling reasons exist to grant the defendant a sentence reduction, rather than relying on an assessment from the Director of the Bureau of Prisons).

- <u>United States v. Anton Jepsen</u>, 19cr73(VLB) (April 1, 2020) (waiving exhaustion requirements for sentenced defendant at Wyatt).

- <u>United States v. Powell</u>, No. 1:94-cr-316-ESH, Doc. # 98 at *1 (D.D.C. Mar. 28, 2020) (granting motion for compassionate release for 55-year-old defendant with asthma and sleep apnea in light of COVID-19 and finding it "would be futile" to require defendant to first exhaust administrative remedies).

- <u>United States v. Resnick</u>, No. 1:12-cr-152-CM, Dkt. No. 461 (S.D.N.Y. Apr. 2, 2020).

- <u>United States v. Foster</u>, No. 1:14-cr-324-02, Dkt. No. 191 (M.D. Pa. Apr. 3, 2020).

- <u>United States v. Winckler</u>, No. 13-cr-318, Dkt. No. 57 (W.D. Pa. Apr. 3, 2020).

All three of these exceptions apply here. "[U]ndue delay, if it in fact results in catastrophic health consequences, could make exhaustion futile. Moreover, the relief the agency might provide could, because of undue delay, become inadequate. Finally, and obviously, [Mr. Smith] could be unduly prejudiced by such delay." <u>Perez</u> at *4. (citing <u>Washington</u>, 925 F.3d at 120–21; <u>see also</u> <u>Bowen v. City of New York</u>, 476 U.S. 467, 483 (1986) (holding that irreparable injury justifying the waiver of exhaustion requirements exists where "the ordeal of having to go through the administrative process may trigger a severe medical setback" (internal quotation marks, citation, and alterations omitted)); <u>Abbey v. Sullivan</u>, 978 F.2d 37, 46 (2d Cir. 1992) ("[I]f the delay attending exhaustion would subject claimants to deteriorating health, . . . then waiver may be

appropriate."); <u>New York v. Sullivan</u>, 906 F.2d 910, 918 (2d Cir. 1990) (holding that waiver was appropriate where "enforcement of the exhaustion requirement would cause the claimants irreparable injury" by risking "deteriorating health, and possibly even . . . death").[46]

The futility and potentially irreparable harm of requiring Mr. Smith to wait a minimum of 30 days to exhaust his administrative remedies are manifest.  Mr. Smith seeks this emergency relief to avoid contracting COVID-19 at USP Marion, where he has a high risk of infection:  "social distancing" is impossible in the crowded facility, and soap, hand sanitizer and disinfectant products are scarce.  Waiting for Mr. Smith to exhaust his administrative remedies would only compound his risk of exposure to COVID-19.  Should he contract the virus while waiting for an administrative response, any remedy will come too late—Mr. Smith will be in danger, causing him potentially irreparable physical harm, and rendering this compassionate release request moot.  <u>See</u>, <u>e.g.</u>, <u>Sorbello v. Laird</u>, No. 06 CV 948 (JG), 2007 WL 675798, at *3 n.8 (E.D.N.Y. Feb. 28, 2007) (refusing to dismiss petition requesting designation to halfway house "for failure to exhaust administrative remedies" where delay in processing administrative remedies would "result in the irreparable harm of late designation to community confinement"); <u>Pimentel v. Gonzales</u>, 367 F. Supp.2d 365, 371 (E.D.N.Y. 2005) (addressing merits of request for designation to halfway house, where "not only would an administrative appeal be futile, but without immediate relief by this court, Pimentel could suffer irreparable harm," as "[w]ere Pimentel required to pursue administrative remedies prior to bringing this action, he would likely be done serving much, if not

---

[46] Although Judge Bolden's analysis in <u>United States v. Paul Gileno</u>, No. 3:19-cr-161-(VAB)-1, 2020 WL 1307108, at *4 (D. Conn. Mar. 19, 2020) differed, the issue was not fully briefed in that case. Moreover, the defendant did not appear to have severe medical issues that constituted pre-existing conditions for purposes of COVID-19.

all of his entire sentence such that his request would become moot.").[47]  In these extraordinary circumstances, the Court should waive the administrative exhaustion requirement in § 3582.

## VI.    Conclusion

For the foregoing reasons, Mr. Smith respectfully requests that the Court grant a reduction in his sentence to time served, with an extended period of supervised release (to cover the unserved portion of his prison term), with a condition of home confinement and GPS monitoring, as well as all of the conditions of supervised release imposed at sentencing.

Respectfully Submitted,

THE DEFENDANT,
Nathaniel Smith

FEDERAL DEFENDER OFFICE

Date: April 05, 2020                 */s/ Kelly S. Barrett*
First Assistant Federal Defender
265 Church Street, 7th FL
New Haven, CT 06510
Phone: (203) 498-4200
Bar No.: ct27410
Email: kelly_barrett@fd.org

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 5, 2020, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Kelly M. Barrett*
Kelly M. Barrett

---

[47] The factual questions at issue—the rapid spread of COVID-19, the serious danger to certain high-risk individuals, and Mr. Smith's health conditions placing him squarely in the highest fatal risk group—are well-developed in the record before this Court, thus rendering administrative exhaustion all but pointless.  See Gurzi, No. 18-CV-3104-NEB-KMM, 2019 WL 6481212, at *2  ("given the clear circumstances here, a principal purpose of administrative exhaustion, the development and crystallization of the factual record, is not implicated in this case."  (quotation marks and citations omitted)).